UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

ING BANK N.V.,

                              Plaintiff,

               -v-

M/V TEMARA et al.,

                        Defendants.

------------------------------------------------------------- X

ING BANK N.V.,

                              Plaintiff,

               -v-

M/V VOGE FIESTA et al.,

                        Defendants.

------------------------------------------------------------- X

ING BANK N.V.,

                              Plaintiff,

               -v-

M/V OCEAN HARMONY et al.,

                        Defendants.

------------------------------------------------------------- X

ING BANK N.V.,

                              Plaintiff,

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>October 21, 2016</u> |

16-cv-95 (KBF)

<u>OPINION & ORDER</u>

16-cv-2051 (KBF)

<u>OPINION & ORDER</u>

16-cv-2923 (KBF)

<u>OPINION  & ORDER</u>

```
                -v-                               :
                                                  :          16-cv-3456 (KBF)
        M/V MARITIME KING et al.,                 :
                                                  :          OPINION & ORDER
                              Defendants.         :
                                                  :
        -----------------------------------------------------------:
                                                  :
        ING BANK N.V.,                            :
                                                  :
                              Plaintiff,          :
                                                  :          16-cv-6453 (KBF)
                -v-                               :
                                                  :          OPINION & ORDER
        M/V JAWOR et al.,                         :
                                                  :
                              Defendants          :
                                                  :
        -----------------------------------------------------------X
```

KATHERINE B. FORREST, District Judge:

ING Bank N.V. ("ING") has filed a number of cases asserting rights to amounts due and payable to O.W. Bunker & Trading A/S ("O.W. Bunker") for the provision of bunkers of fuel oil to vessels.  With regard to the above-captioned cases, ING's claims depend on (1) its assertion that O.W. Bunker has maritime liens in bunkers supplied to the vessels, and (2) that O.W. Bunker validly assigned its right to receive any monies due pursuant to such liens to ING.  ING has now moved for summary judgment in each of the above actions on these two questions.  (16-cv-95

ECF No. 146; 16-cv-2051 ECF No. 48; 16-cv-2923 ECF No. 56; 16-cv-3456 ECF No. 105; 16-cv-6453 ECF No. 40.)

As set forth below, O.W. Bunker does not have an enforceable maritime lien. Accordingly, summary judgment is DENIED as to the first question and the Court need not reach the second.

## I.     FACTS RELEVANT TO RESOLUTION OF THESE MOTIONS

There is a core set of undisputed facts common to each case and dispositive of the question of whether O.W. Bunker has a maritime lien. The Court refers the reader to the various submissions of the parties in connection with these motions for further discussion of the facts. Plaintiff's Rule 56.1 Statements of Undisputed Material Facts (16-cv-95 ECF No. 148 ("ING 56.1 TEMARA"); 16-cv-2051 ECF No. 50 ("ING 56.1 VOGE FIESTA"); 16-cv-2923 ECF No. 58 ("ING 56.1 OCEAN HARMONY"); 16-cv-3456 ECF No. 107 ("ING 56.1 MARITIME KING"); 16-cv-6453 ECF No. 41 ("ING 56.1 JAWOR")); Defendants' Rule 56.1 Statements of Undisputed Material Facts (16-cv-95 ECF No. 158 ("TEMARA 56.1"); 16-cv-2051 ECF No. 60 ("VOGE FIESTA 56.1"); 16-cv-2923 ECF No. 72 ("OCEAN HARMONY 56.1"); 16-cv-3456 ECF No. 117 ("MARITIME KING 56.1 "); 16-cv-6453 ECF No. 43 ("JAWOR 56.1")).  In sum, in each case, the charterer entered into a contractual relationship with O.W. Bunker[1] for the supply of bunkers.

---

[1] In the cases of the TEMARA and VOGE FIESTA, the O.W. Bunker entity was O.W. Bunker (Denmark); in OCEAN HARMONY the O.W. Bunker entity was O.W. Bunker (U.K), in the MARITIME KING the O.W. Bunker entity was O.W. Bunker (Switzerland), and in JAWOR the O.W. Bunker entity was O.W. Bunker (Middle East).

It is undisputed that O.W. Bunker itself never physically supplied or provided bunkers to any of the vessels.  ING argues that O.W. Bunker provided bunkers through third parties.  The Court will return to this point later in this decision but, for the moment, focuses on who physically performed various acts.  In that regard, it is undisputed that O.W. Bunker was not a physical supplier.

Below, the Court reviews the facts pertinent to each of the vessels as to which ING has asserted a maritime lien.  As the facts regarding the relationships between O.W. Bunker and the charterer are largely the same (for instance, the order confirmations and terms and conditions contain materially similar language), the Court addresses TEMARA at greater length to describe such facts.  The Court does not repeat the same information for the other vessels but focuses instead on the supply arrangement.

A. <u>TEMARA</u>

The TEMARA is owned by Cimpship Transportes Maritimos, S.A. ("Cimpship") and during the relevant period was chartered by Copenship Bulkers A/S ("Copenship").  In October 2014 Copenship contacted O.W. Bunker (Denmark) to arrange for the TEMARA to be supplied with bunkers at an upcoming stop in Balboa, Panama.  O.W. Bunker responded by sending Copenship a sales order confirmation ("Confirmation") for the sale of 400 metric tons of fuel.   The Confirmation also made the agreed-upon sale "subject to the O.W. Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers" and provided that "acceptance

of the marine bunkers by the vessel . . . shall be deemed to constitute acceptance of the said general terms[.]"

The Terms and Conditions define "Seller" to mean O.W. Bunker and "Buyer" to mean "the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made."  The term "Supplier" was defined as "any party instructed by or on behalf of the Seller to supply or deliver the Bunkers."

The Terms and Conditions were made applicable to all orders, agreements, and contracts "except where otherwise is expressly agreed in writing by [the International O.W. Bunker Group, or OWB]."  They also provided that "[g]eneral trading conditions of another party will not apply, unless expressly accepted in writing by OWB."

Neither the Confirmation nor the Terms and Conditions contain any reference to the Seller acting as the Buyer's agent or possessing the power to bind the Buyer to any agreement.  After the agreement between Copenship and O.W. Bunker was reached, O.W. Bunker arranged to utilize the services of O.W. Bunker USA Inc. ("OW USA"), a "bunker intermediary."  The record before the Court is devoid of any documentation regarding that arrangement.

5

On October 3, 2014, the same day O.W. Bunker and OW USA entered into some form of agreement, OW USA separately contracted with CEPSA to physically supply bunkers to the TEMARA.  Nothing in the record supports any knowledge by O.W. Bunker of this additional arrangement or its assent to any of the terms of this agreement.

CEPSA's confirmation document listed the following term: "CEPSA GENERAL TERMS AND CONDITIONS OF SALE (REV. OCT 01, 2011) TO APPLY, A COPY OF WHICH AVAILABLE ON REQUEST."

In CEPSA's Terms and Conditions, CEPSA is identified as "THE SELLER," while "THE BUYER" is the entity that provides CEPSA "written notice of the Request for Supply," which must comply with certain informational requirements. The invoicing and payment terms provide that payment shall be made by the Buyer to the Seller.

CEPSA's Terms and Conditions also provide that title of the bunkers transfers to the Buyer once it has fully paid CEPSA the purchase price, but "[u]p to that moment, 'THE SELLER' shall continue to be the owner of the Marine Fuel supplied."  Among the final provisions in the document is a prohibition on the Buyer assigning all or part of the supply ordered to a third party without the Seller's prior written consent.  The Terms and Conditions do not identify the Buyer as the agent of the ship's owner, charterer, or any other entity.

On October 9, 2014, CEPSA physically supplied bunkers to the TEMARA in Balboa, Panama.  After delivery, CEPSA generated and provided a Bunker Receipt,

which was signed by the TEMARA's Chief Engineer, who also stamped the receipt with a stamp bearing the names Cimpship and TEMARA.

Also on October 9, 2014, O.W. Bunker issued an invoice in the amount of $221,812.95 to the TEMARA and its charterer, Copenship. Payment was made due "30 days from date of delivery." The invoice further stated that "All O.W. BUNKER & TRADING A/S's rights under this invoice and the supply contract between us (the Supply Contract) have been assigned in favour of ING Bank N.V." and instructed Copenship "to pay all amounts payable under this invoice to . . . ING Bank N.V." The invoice does not reference either OW USA or CEPSA. Neither O.W. Bunker nor ING was ever paid the amount listed on the invoice.

On October 13, 2014, CEPSA issued an invoice in the amount of $217,859.49 to OW USA. Payment was made due November 8, 2014, and was directed to "be made directly to CEPSA INTERNATIONAL B.V." The invoice does not reference O.W. Bunker, Copenship, or Cimpship. CEPSA has not been paid the amount listed on the invoice.

O.W. Bunker (Denmark) did not take on any risk (financially or in goods provided) with regard to the provision of bunkers to the TEMARA. That is, it never assumed title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers. At most, O.W. Bunker's risk was a theoretical risk of a failure to deliver on its contract to the charterer; no exposure from this risk ever materialized.

7

B. <u>VOGE FIESTA</u>

At all relevant times, the VOGE FIESTA was chartered by Primetransport LTD ("Primetransport").  In October 2014, Primetransport nominated O.W. Bunker (Denmark) to supply bunkers to the VOGE FIESTA.  (ING 56.1 VOGE FIESTA ¶ 1.)  O.W. Bunker issued a Confirmation to Primetrasport in materially the same form as that discussed above including with regard to the definitions of Buyer and Seller. (<u>Id.</u> ¶¶ 2-3.)

ING asserts that "At no time did Primetransport LTD or the owners of the VOGE FIESTA appoint O.W. Bunker as their agent or other representative to procure bunkers for the vessel in Singapore."  (ING 56.1 VOGE FIESTA Ex. 1, Dec. of Claus Erik Mortenson ¶ 15.)  That is, while O.W. Bunker was nominated to provide bunkers, Primetransport did not authorize O.W. Bunker to use intermediaries in the capacity of an "agent."

O.W. Bunker subsequently utilized the services of Cathay Marine Fuel Oil Trading Pte Ltd. ("Cathay") and Impex Marine (S) Pte Ltd ("Impex") in Singapore to arrange for the physical delivery of bunkers on behalf of O.W. Bunker to the VOGE FIESTA. (ING 56.1 VOGE FIESTA ¶ 8.) The bunkers were delivered by these entities.  The record does not contain a contract or other evidence of the terms between Cathay and Impex and O.W. Bunker.  Further, as ING has also  stated, "At no time did Primetransport or the owners of M/V VOGE FIESTA or any other person direct, instruct, order or require O.W. Bunker to utilize Cathay and Impex

as the physical supplier of the bunkers." (Id. ¶ 10.)  Neither Cathay nor Impex have been paid for their supply of the bunkers.

At no time did O.W. Bunker (Denmark) take on any risk (financially or in goods provided) with regard to the provision of bunkers to the VOGE FIESTA.  It never assumed title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers.  At most, O.W. Bunker's risk was a theoretical risk of a failure to deliver on its contract to the charterer; no exposure from this risk ever materialized.

C.  JAWOR

At all relevant times, Able Glory Maritime Co., Ltd. ("Able Glory") was the charterer of the JAWOR.  It ordered marine fuel bunkers from O.W. Bunker Middle East DMCC to be supplied to the vessel in Singapore.  (ING 56.1 JAWOR at 1.)  O.W. Bunker Middle East DMCC utilized the services of an intermediary, O.W. Bunker Far East (S) Pte Ltd ("O.W. Bunker Far East") to supply the bunkers to JAWOR.  (Id.)  The terms of that arrangement are not in the record.  O.W. Far East, in turn, acquired bunkers from Coastal Energy Pte Ltd as intermediary and seller of the product; this entity, in turn, utilized the services of Triton Bunkering Services Pte Ltd. to arrange for the physical delivery of bunkers on behalf of O.W. Bunkers and the JAWOR. (Id. at 2.)  Triton has not been paid for its supply of the bunkers.

At no time did O.W. Bunker take on any risk (financially or in goods provided) with regard to the provision of bunkers to the JAWOR.  It never assumed

9

title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers.  At most, O.W. Bunker's risk was a theoretical risk of a failure to deliver on its contract to the charterer; no exposure from this risk ever materialized.

D. <u>MARITIME KING</u>

At all relevant times, Cobelfret was the charterer of the Maritime King.  On October 29, 2014, O.W. Bunker (Switzerland) was nominated to supply bunkers to the vessel.  The parties exchanged an order confirmation in materially similar form as that described with regard to TEMARA above.  O.W. Bunker subsequently utilized the services of an intermediary, OWB Middle East Division ("OWB India") to supply the bunkers. (ING 56.1 MARITIME KING ¶ 8).  The terms of that arrangement are not in the record.  OW India, in turn, utilized the services of Chemoil Adani Private Limited ("Chemoil") to physically supply the bunkers.  (<u>Id.</u> ¶ 9.)  Chemoil supplied the bunkers on November 5, 2014. (ING 56.1 MARITIME KING ¶ 13.)  Chemoil has not been paid for its supply of the bunkers.

At no time did O.W. Bunker (Switzerland) take on any risk (financially or in goods provided) with regard to the provision of bunkers to the MARITIME KING.  It never assumed title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers.  At most, O.W. Bunker's risk was a theoretical risk of a failure to deliver on its contract to the charterer; no exposure from this risk ever materialized.

E. <u>OCEAN HARMONY</u>

At all relevant times, Bulk Atlantic Inc. ("Bulk Atlantic") was the charterer of the OCEAN HARMONY.  On October 13, 2014, Bulk Atlantic nominated O.W. Bunker (U.K.) to supply bunkers to the OCEAN HARMONY. (ING 56.1 OCEAN HARMONY ¶ 1.)  O.W. Bunker provided Bulk Atlantic with a sales order confirmation and terms and conditions in substantially the same form as those set forth above. (<u>Id.</u> ¶¶ 2-7.)  O.W. Bunker subsequently utilized the services of an intermediary, O.W. Bunker Malta, Ltd – OWB Piraeus SC ("OW Malta") to supply the bunkers.  (<u>Id.</u> ¶ 8.)  The terms of that arrangement are not in the record.  OW Malta, in turn, subcontracted with the third party supplier EKO for the delivery of the bunkers.  The bunkers were in fact delivered by yet another third party, Seka S.A. ("Seka").  (<u>Id.</u> ¶ 9.)  ING asserts that "At no time did Bulk Atlantic Inc. or the owners of the OCEAN HARMONY or any other person direct, instruct, order or require O.W. Bunker to utilize Seka as the physical supplier of the bunkers for the vessel in Greece." (<u>Id.</u> ¶ 12.)  Seka has not been paid for its provision of the bunkers.

In addition, at no time did O.W. Bunker (UK) take on any risk (financially or in goods provided) with regard to the provision of bunkers to the OCEAN HARMONY.  It never assumed title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers.  At most, O.W. Bunker's risk was that theoretical risk of a failure to deliver on its contract to the charterer of any contractual exposure it may thereby have incurred. This potential risk never materialized.

I.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted).  In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

II.    MARITIME LIENS

"As a general rule, maritime liens are disfavored by the law."  Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 982 F.2d 765, 768 (2d Cir. 1992). They arise only by operation of law, and not by the agreement of the parties.  See, e.g., The Bird of Paradise, 72 U.S. 545, 555 (1866).  Moreover, because such liens operate without requiring the parties' agreement, the statutory provisions creating maritime liens are stricti juris and will be accorded a technical and precise interpretation that will not be extended by construction, analogy, or inference.  Itel

Containers, 982 F.2d at 768 (citing Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12 (1920)).

The Commercial Instruments and Maritime Lien Act ("CIMLA") provides the statutory scheme governing maritime liens.   Under CIMLA, a party claiming a maritime lien against a vessel must show each of the following: (1) it provided necessaries, (2) to a vessel, (3) upon the order of the owner of the vessel or a person authorized by the owner.  46 U.S.C. § 31342(a).  "Necessaries" include, among other things, bunkers.  See Itel Containers, 982 F.2d at 767.[2]

Maritime liens are a statutory creations intended to protect those who do, in fact, provide necessaries to vessels.  The legislative history surrounding CIMLA and its predecessor statutes confirms that its purpose is to facilitate maritime commerce by "protect[ing] terminal operators, ship chandlers, ship repairers, stevedores and other suppliers who in good faith furnish necessaries to a vessel."  H.R. Rep. No. 92-340, 92nd Cong. 1st Sess. (1971); see also Tramp Oil & Marine, Ltd. v. M/V Mermaid I, 805 F.2d 42, 46 (1st Cir. 1986) ("The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services."); Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty, 608 F.2d 197, 201 (5th Cir. 1979) ("Our review [of the legislative history] leads us inexorably to the conclusion that it was the intent of Congress to make it easier and more certain for stevedores and others to protect their interests by making maritime liens available where

---

[2] CIMLA also defines "persons . . . presumed to have authority to procure necessaries for a vessel:" (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by--(A) the owner; (B) a charterer; (C) an owner pro hac vice; or (D) an agreed buyer in possession of the vessel."  46 U.S.C. § 31341(a).

14

traditional services are routinely rendered."); L&L Elecs., Inc. v. M/V OSPREY, 764 F. Supp. 2d 270, 273 (D. Mass. 2011) ("The purpose of a maritime lien, therefore, is to encourage the provision of goods and services, especially in distant ports, by providing an in rem claim against the vessel itself should the party controlling the vessel's affairs abscond.").

The statute's "overarching goal" in providing the extraordinary remedy of a maritime lien "is keeping the channels of maritime commerce open by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation." Mullane v. Chambers, 438 F.3d 132, 138 (1st Cir. 2006). "The maritime lien is designed not only for the benefit of material men, but for the advantage of the vessel, which, in contingencies that are liable to arise in navigation, might otherwise be unable to proceed upon her voyage." The Willamette Valley, 66 F. 565, 570 (9th Cir. 1895). That is, the statute enables the provision of necessary goods or services on credit, and correspondingly provides protection against loss for the same.

The key issue in determining whether O.W. Bunker has a maritime lien is what the term "provided" means under CIMLA. Dresdner Bank AG v. M/V OLYMPIA VOYAGER, 465 F.3d 1267, 1274 (11th Cir. 2006) ("A lien for necessaries arises, pursuant to clear statutory language, when the claimant provides necessaries to the vessel.") (emphasis in original). Can O.W. Bunker, steps removed from the physical provision of bunkers and never having had a tangible financial

risk with regard to them, be deemed to have "provided" them?  The word "provided" is not defined in the statute.  In terms of statutory intent and relevant case law, the term "provided" clearly embodies a concept of payment protection for an entity that has put itself at financial or other risk in providing necessaries to vessels.  See Tramp Oil & Marine, 805 F.2d at 46.  The statute uses the past tense of the term ("provided") to convey the concept of a potential lien holder having accomplished an act.  This Court is unaware of an instance in the maritime lien context in which the term "provided" has been interpreted as having received and confirmed a sales order, but where the actual physical supplier is removed from any such relationship, lacks privity with the purported lien-seeker, and has no contractual payment right from the purported lien-seeker.

Over the years, various courts have considered whether an entity that contracts with another for the provision of necessaries can itself be deemed to have provided them under the statute.  In general, the answer is yes.  But in those cases, there is privity and/or a financial payment obligation between the physical supplier and contractor.  For instance, in Galehead, Inc. v. M/V ANGLIA, 183 F.3d 1242 (11th Cir. 1999), the Court affirmed the district court's finding that while the plaintiff had not physically supplied the bunkers at issue, it had contracted with the entity that had and this was sufficient to support a maritime lien.  Id. at 1245.  The Court cited the well-known contractual principle that "A contracts to deliver to B coal of a specified kind and quality.  A delegates the performance of this duty to C, who tenders to B coal of the specified kind and quality.  The tender has the effect of

16

a tender by A."  Id. (citing Restatement (Second) of Contracts § 318 cmt. A, illus. 2.).
In A/S Dan-Bunkering Ltd. v. M/V Zamet, 945 F. Supp. 1576 (S.D. Ga. 1996), and
Exxon Corp. v. Central Gulf Lines, Inc., 780 F. Supp. 191 (S.D.N.Y. 1991), a
contractor was granted a maritime lien when the contractor had actually paid the
invoices for the supply of bunkers by a subcontractor.  Similarly, in The Golden
Gate, 52 F.2d 397, 400 (9th Cir. 1931), the plaintiff was found to have a maritime
lien when it purchased and arranged for delivery of the oil from a third party.

　　　These cases are consistent with the basic principles behind the statutory
creation of maritime liens.  Maritime liens are created to provide protection, not to
enable a windfall.  Thus, for instance, if Party A subcontracts to Party B for
bunkers for a vessel, and B subcontracts to C (and even C contracts to D, etc.), in
order for Party A to have a maritime lien (versus something else), the contractual
chain between A and C (or D) must be traceable and intact, ultimately placing A at
financial risk for the bunkers provided.

　　　Thus, in the context of a maritime lien, "providing" may encompass a direct
contractual relationship with the entity physically supplying the bunkers where
there has been, or is promised to be, payment or other consideration to that entity
and so on, each step down the chain.

　　　　Other than various cases ING has brought in other district courts on facts
similar to those here pending in other jurisdictions, this Court has not found any
case in which a court has interpreted necessaries to have been "provided" in the

absence of some financial obligation.[3]  The case law does not support awarding a maritime lien in a non-risk—and therefore non-protective—circumstance.

### B. Does Someone Always Have a Maritime Lien?

The question naturally arises whether some entity will always have a maritime lien if necessaries are provided to a vessel.  The answer is no.  Maritime liens are creatures of statute—and if the statutory requirements are not met, then a lien does not exist.  See Tramp Oil & Marine, 805 F.2d at 46 ("[I]t seems clearly preferable to insist upon the slight technical requirement of [the statute] than to open a wide door to the proliferation of maritime liens.").  ING's position appears to assume that at least a significant reason why it must have a maritime lien is because O.W. Bunker is better positioned vis-à-vis than any other entity in the chain.  This is fundamentally misguided.

The provision of necessaries does not always give rise to a maritime lien.  For instance, as the litigants before this Court have themselves witnessed in their own cases, a physical supplier who does not provide necessaries "on the order of" the owner or one authorized by the owner, lacks a maritime lien.  ING Bank N.V. v.

---

[3] ING has not pursued an agency argument.  In all events, the undisputed facts would not support an agency relationship: ING has previously argued that certain physical suppliers had relationships with a subcontractor—and no relationship with O.W. Bunker.  "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01 (2006).  Agency can result from "actual" or "true" authority, which can be either express or implied, id. § 2.01, or "apparent" authority, which results "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Id. § 2.03.  The burden of proving an agency relationship is on the party who asserts the existence of the relationship.  See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 72 (2d Cir. 2012).  "While the existence of an agency relationship often turns on questions of fact, the issue is properly resolved as a matter of law where, as here, the relevant facts are uncontroverted."  Johnson v. Priceline.com, 711 F.3d 271, 275 (2d Cir. 2013).

M/V Temara, No. 16-cv-95, 2016 WL 4471901 (S.D.N.Y. Aug. 24, 2016); Aegean

Bunkering (USA) LLC v. M/T Amazon, No. 14-cv-9447, 2016 WL 4471895 (S.D.N.Y.

Aug. 24, 2016).  Because of "the Second Circuit's current commitment to a stricti

juris approach to maritime liens," even entities that have suffered a loss by

providing uncompensated necessaries to a vessel are not entitled to a lien unless

they meet the precise statutory requirements of CIMLA.  Integral Control Sys.

Corp. v. Consolidated Edison Co., 990 F. Supp. 295, 301 (S.D.N.Y. 1988).

Similarly, when a vessel has been arrested and a party provides necessaries,

a maritime lien does not attach—the seizure revokes all authority to incur

liabilities. See Dresdner Bank, 465 F.3d at 1272-73 (collecting cases).

III.    DISCUSSION

The undisputed facts make it clear that O.W. Bunker does not have a

maritime lien for the provision of bunkers to the vessels herein.  With the exception

of the placement of sales order with the charterer, nothing in the record suggests

O.W. Bunker took on any risk in connection with providing necessaries: It did not

itself physically supply any of the bunkers, and it is undisputed that it never paid

any supplier that did.  Nothing in the record supports any payment obligation by

O.W. Bunker to the physical supplier—either directly or indirectly.  The record is

devoid of information regarding O.W. Bunker's arrangements down the chain.

Thus, a maritime lien here would not fulfill its essentially protective function; it

would instead award a windfall.  Had O.W. Bunker paid the physical suppliers, the

outcome might be different.  But O.W. Bunker is in bankruptcy and ING has made

19

it clear that even if were to recover on O.W. Bunker's behalf, it has neither

obligation and nor intention to pay the physical suppliers.  To establish a maritime

lien requires more than the initial sales order O.W. Bunker received from the

charterer.  The sales order and confirmation only establish the "authorization"

portion of the test under CIMLA.  CIMLA also requires that the necessaries be

<u>provided</u> by the entity seeking the lien.  The term "provided" directly implies an out-

of-pocket expense or liability worthy of protection.  Here, O.W. Bunker meets

certain first steps of the CIMLA test (necessaries and authorization), but fails the

final one (providing).

ING's position to the contrary relies on a distorted reading of CIMLA and the

concept of a maritime lien.  Both the existence of and the strict limitations on

maritime liens serve the same end: facilitating the flow of commerce across oceans

and borders.  A maritime lien is a truly extraordinary remedy—more powerful and

more strictly construed than other liens—that mitigates the similarly extraordinary

risk taken by suppliers of maritime vessels.  <u>See</u> <u>Crimson Yachts v. Betty Lyn II</u>

<u>Motor Yacht</u>, 603 F.3d. 864, 869 (11th Cir. 2010) ("Maritime liens have special

features designed to protect persons who own, sail, and service ships from the

unique risks associated with the shipping industry."); Thomas J. Schoenbaum, 1

Admiralty & Mar. Law § 9-1 (5th ed. 2015) ("[A] maritime lien . . . keep[s] ships

moving in commerce while preventing them from escaping their debts by sailing

away.  The maritime lien is unique to admiralty law and has many characteristics

that differ from other forms of liens.").  Without the protection of a maritime lien to

abate this unique risk, vessels would face greater obstacles to undertaking and completing their voyages—including higher supply prices likely to be passed to all participants in the stream of commerce.  See Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 9 (1920) ("The maritime lien developed as a necessary incident of the operation of vessels . . . .  [A ship] is peculiarly subject to vicissitudes which would compel abandonment of vessel or voyage, unless repairs or supplies were promptly furnished."); Trans-Tec. Asia v. M/V HARMONY CONTAINER, 518 F.3d 1120, 1130 (9th Cir. 2008) ("'Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels to that they can be speedily turned around and put to sea.  This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed.'" (quoting H.R. Rep. No. 92-340, 92nd Cong. 1st Sess. (1971)).  Yet without strict circumscription of maritime liens, frequent arrests would impede the progress of individual vessels and deprive owners, charterers, and cargo interests of the certainty necessary for smooth operation of seabound trade.  See Equilease Corp. v. M/V Sampson, 793 F.2d 598, 602 (5th Cir. 1986) ("The [Federal Maritime Lien Act] is essentially a compromise between two conflicting interests: that of the materialmen, who wanted an automatic and far-reaching lien, and that of the shipowners, who preferred never to have any lien attach.").  Therefore, a maritime lien is available only when the precise statutory elements are met, including limitation to those who "provided" the necessaries, i.e., those facing real risk of

financial loss that accompanies the actual <u>provision</u> of goods and services to a vessel that "is, of necessity, a wanderer."  2 Benedict on Admiralty § 21 (7th ed. 2013).

ING's position in these cases is removed from these basic purposes.  O.W. Bunker neither provided credit nor experienced loss; it is simply the holder of an order confirmation as to which it has no contractual exposure as its obligations thereunder were fulfilled by another.  But, as we know, maritime liens are not created by contract—ING has itself made similar arguments in connection with motion practice against the physical suppliers.  <u>Temara</u>, 2016 WL 4471901 at *5 (Maritime liens "can only arise by operation of law, and not by the agreement of the parties." (citing <u>The Bird of Paradise</u>, 72 U.S. (Wall) at 555); <u>see, e.g.</u>, ING Reply Brief in Support of Motion for Summary Judgment at 5, <u>Aegean Bunkering (USA) LLC v. M/V AMAZON et al.</u> (No. 14-cv-9447) (ECF No. 135 at 8) ("It is settled law in the United States that a maritime lien can arise only by operation of law, regardless of any agreement by the parties." (internal quotation marks omitted)).

Accordingly, to find that O.W. Bunker has a maritime lien would be to move away from the most basic purpose of CIMLA of insuring that those who provide necessaries to ships in truth and in fact are not left without recourse.  CIMLA is not a complex financial instrument—nor is it a contractual right.  In the context of this complicated world, its purposes and meaning are simple.  Applied to the undisputed facts here, it is clear that O.W. Bunker lacks a maritime lien.  As a result, this

Court need not reach the question of whether the assignment O.W. Bunker made to ING validly conveyed such liens.[4]

## VI.   CONCLUSION

For the reasons set forth above, ING's motions for summary judgement as to a maritime lien are DENIED; the Court therefore finds it unnecessary to reach the question of whether the assignment is valid.[5]  While defendants in the cases commenced by ING have not cross-moved for summary judgement, this Court can nonetheless enter judgment in their favor.  See Bridgeway Corp. v. Citibank, 201 F.3d 134, 140 (2d Cir. 2000).  Accordingly, ING's motions for summary judgment in the following cases that ING has commenced are hereby terminated: ING Bank N.V. v. M/V TEMARA, 16-cv-95; ING Bank N.V. v. M/V VOGE FIESTA, 16-cv-2051; ING Bank N.V. v. M/V OCEAN HARMONY, 16-cv-2923; ING Bank N.V. v. M/V MARITIME KING, 16-cv-3456; ING Bank N.V. v. JAWOR M/V, 16-cv-6453.  The Clerk of Court is also directed to terminate the motions at 16-cv-3456 ECF Nos. 53 and 79.  The Court enters judgment on behalf of defendants in each case.

In all cases, including those in which ING was joined as a party (Aegean Bunkering (USA) LLC v. M/T AMAZON et al., No. 14-cv-9447, and O'Rourke Marine Services L.P. v. M/V COSCO HAIFA et al., 15-cv-2992), the Court directs

---

[4] It is of no moment that O.W. Bunker's Sales Order Confirmation referred to a maritime lien; provisions relating to such a lien do not themselves create a lien but may simply apply in the event a lien otherwise exists.

[5] Fiona Two Shipping, claimant to the JAWOR, argues that CIMLA is inapplicable to the underlying transactions in that case.  Because ING would not have a maritime lien against the JAWOR in any event, the Court need not reach that choice-of-law issue.

the plaintiffs in those actions to inform the Court within 10 days from the date of

this Opinion & Order as to how they suggest the matters should proceed.


      SO ORDERED.

Dated:      New York, New York
             October 21, 2016


_____
      KATHERINE B. FORREST
      United States District Judge